## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KAREN O'KELLY | ) | Case No. 5:19-cv-02285 |
| f/k/a KAREN LANGENFELD, | ) | |
| | ) | Judge J. Philip Calabrese |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL RESERVE BANK OF | ) | |
| CLEVELAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Karen O'Kelly is a former employee of the Federal Reserve Bank of Cleveland. While working at the Federal Reserve, Ms. O'Kelly enrolled in the long-term disability income plan offered to employees. In 2017, she claimed disability benefits under this plan. Although the plan's claim administrator initially approved Ms. O'Kelly's application, it terminated her disability benefits in 2018. After two appeals, the administrator finally denied her claim in 2019. Plaintiff then filed suit in federal court, seeking to reverse the administrator's denial and reinstate her benefits. Plaintiff and Defendants filed cross motions for summary judgment. For the following reasons, the Court **DENIES** Plaintiff's motion for summary judgment (ECF No. 23) and **GRANTS** Defendants' motion for summary judgment (ECF No. 24).

## STATEMENT OF FACTS

The Federal Reserve Bank of Cleveland formerly employed Plaintiff Karen O'Kelly. (ECF No. 1, ¶ 1, PageID #2; ECF No. 15, ¶ 1, PageID #51.) While employed,

Ms. O'Kelly enrolled in the long-term disability income plan for employees of the Federal Reserve System.  (*Id.*)  The Federal Reserve contracts with Matrix Absence Management, Inc. to perform certain claim administration duties on behalf of the plan.  (ECF No. 1, ¶ 2, PageID #2; ECF No. 15, ¶ 2, PageID #51.)

### A.    Scope of the Long-Term Disability Income Plan

The plan provides long-term disability benefits to employees of the Federal Reserve who are unable to work due to a mental or physical disease or bodily injury.  (ECF No. 18-12, PageID #1813.)  Plan participants are eligible for benefits if they are determined to be totally disabled.  (*Id.*, PageID #1825.)  The plan defines total disability for two distinct periods.  (*Id.*, PageID #1823.)  First, during the 18-month period following the participant's submission of the proof of disability, the plan participant is totally disabled if her disability precludes work on a regular and full-time basis at the participant's own job or another job in her same occupation.  (*Id.*, PageID #1820 & #1823.)  Second, after that 18-month period, the plan participant is totally disabled if the disability precludes work in any occupation.  (*Id.*, PageID #1814 & #1823.)

To administer benefits under the plan, the plan administrator appoints a medical board to act as the claim administrator.  (*Id.*, PageID #1821 & #1833.)  The plan administrator may appoint either a third-party administrator or one or more physicians as the medical board.  (*Id.*, PageID #1833.)  The medical board has the authority to make all determinations of total disability on claims plan participants submit.  (*Id.*)  The medical board makes these determinations in its sole discretion.  (*Id.*, PageID #1823.)

### B.     Ms. O'Kelly's Claim for Long-Term Disability Benefits

Ms. O'Kelly last worked on August 31, 2016.  (ECF No. 1, ¶ 6, PageID #2; ECF No. 15, ¶ 6, PageID #52.)   After exhausting her short-term disability benefits, Ms. O'Kelly filed a claim for long-term disability benefits on December 8, 2016.  (ECF No. 18-1, PageID #236; ECF No. 18-22, PageID #3639.)  For Ms. O'Kelly's claim, third-party administrator Matrix Absence Management, Inc. served as the medical board and claim administrator.

#### B.1.   Initial Approval

Around the same time that she applied for benefits under the plan, Ms. O'Kelly also filed for social security disability benefits.  (ECF No. 18-8, PageID #1235.)  For her social security claim, Ms. O'Kelly underwent an independent psychological medical examination in February 2017.  (*Id.*, PageID #1204.)  The Social Security Administration deemed Ms. O'Kelly disabled due to limitations arising from "psychologically based symptoms."  (*Id.*, PageID #1235.)

After receiving the February 2017 psychological report, Matrix Absence Management determined that the medical records supported impairment due to depression, anxiety, and neurocognitive disorder.  (ECF No. 18-1, PageID #238.)  At this time, Matrix Absence Management determined that the medical records did not support impairment related to other conditions alleged by Ms. O'Kelly, including mold toxicity, heavy metal exposure, and chronic inflammatory response syndrome. (*Id.*)  Based on its finding of impairment, Matrix Absence Management determined that Ms. O'Kelly could not perform her occupation.  (*Id.*)  Accordingly, Matrix Absence Management approved Ms. O'Kelly's claim for the 18-month period provided under

the plan.  (*Id.*)  This 18-month period commenced on August 31, 2016, Ms. O'Kelly's last day of work, and ended on March 1, 2018.  (*Id.*)

### B.2.    Termination of Benefits

On September 5, 2017, Matrix Absence Management informed Ms. O'Kelly that it was conducting a review of her claim in advance of the expiration of the 18-month period.  (ECF No. 18-3, PageID #363.)  The purpose of the review was to determine whether Ms. O'Kelly was totally disabled for the plan's second period of time, meaning that her disability precluded work in any occupation.  (*Id.*)

On January 22, 2018, Matrix Absence Management informed Ms. O'Kelly it was terminating her long-term disability benefits.  (ECF No. 18-3, PageID #392.) Based on its review, Matrix Absence Management determined that Ms. O'Kelly was not totally disabled from performing any occupation.  (*Id.*, PageID #395.)  Further, Matrix Absence Management determined that she was not totally disabled from performing her own occupation.  (*Id.*)  Therefore, the termination took effect immediately on January 19, 2018.  (*Id.*)

In its termination letter, Matrix Absence Management informed Ms. O'Kelly of her appeal rights.  (*Id.*)  Specifically, Matrix Absence Management informed her that her appeal must be submitted in writing within 90 days.  (*Id.*)  Matrix Absence Management advised her to include in her appeal any documentation, including medical data, that she felt supported her claim for disability benefits.  (*Id.*)

### B.3.    First Appeal

Ms. O'Kelly timely appealed the termination of her benefits.  (ECF No. 18-12, PageID #1849–51.)    She submitted additional evidence, including medical

examination and laboratory reports, information regarding the skill level required to perform her occupation, and an affidavit containing her testimony.  (*Id.*, PageID #1849–50.)  Based on Ms. O'Kelly's appeal and the additional information presented, Matrix Absence Management referred her file back to its claims department for reconsideration of its initial decision.  (ECF No. 18-3, PageID #401.)  On October 12, 2018, Matrix Absence Management again denied her claim for disability benefits.  (*Id.*, PageID #404.)

### B.4.   Second Appeal

On January 10, 2019, Ms. O'Kelly again appealed Matrix Absence Management's denial of benefits.  (ECF No. 18-18, PageID #3145.)  Ms. O'Kelly again attached additional information to her appeal.  (*Id.*)  Matrix Absence Management issued a final denial on May 7, 2019.  (ECF No. 18-22, PageID #3639.)  In its denial letter, Matrix Absence Management summarized all the medical evidence and medical opinions it considered.  (*Id.*, PageID #3639–71.)

### C.   Matrix Absence Management's Review of Ms. O'Kelly's Claim

As outlined above, after Matrix Absence Management initially approved Ms. O'Kelly's claim for long-term disability benefits, it undertook a review of her claim based on updated medical records.  Based on this review, it terminated her benefits. On each of Ms. O'Kelly's two appeals of its decision, Matrix Absence Management considered additional information provided by Ms. Kelly and additionally sought and obtained medical opinions from independent sources.

### C.1.    Review of Ms. O'Kelly's First Appeal

After Ms. O'Kelly's first appeal, Matrix Absence Management conducted a review of her claim on reconsideration.  (ECF No. 18-3, PageID #401.)  As part of this reconsideration, Matrix Absence Management arranged for an independent medical exam of Ms. O'Kelly and submitted Ms. O'Kelly's medical and vocational information to two physicians for review.

### C.1.i. Medical Exam by Dr. Swales

Dr. Thomas Swales, Ph.D., is a board-certified psychologist.  (ECF No. 18-15, PageID #2307.)   He completed an independent neuropsychological evaluation of Ms. O'Kelly on September 19, 2018.   Dr. Swales concluded that Ms. O'Kelly's subjective cognitive complaints were inconsistent with objective findings and that there was no evidence of neurocognitive impairment.  (*Id.*, PageID #2334.)  Regarding Ms. O'Kelly's reports of anxiety and depression, Dr. Swales noted that she failed a symptom validity test and her test scores were indicative of likely feigning.  (*Id.*)

### C.1.ii. Peer Reviews by Dr. Swotinsky and Dr. Washington

Matrix Absence Management submitted all of Ms. O'Kelly's medical and vocational information to two board-certified peer physicians:  Dr. Swotinsky, a preventative and occupational medicine physician with a specialty in toxicology; and Dr. Washington, a double-boarded physician in psychiatry and neurology. Dr. Swotinsky concluded that, beginning on January 19, 2018, there was no support for any restrictions or limitations related to any physical diagnosis.  (ECF No. 18-13, PageID #2020.)  Similarly, Dr. Washington concluded that there was no support for impairment from neurologic or mental health conditions.  (*Id.*, PageID #2029.)

6

### C.2.    Review of Ms. O'Kelly's Second Appeal

On Ms. O'Kelly's second appeal, Matrix Absence Management obtained two additional peer physician reviews of Ms. O'Kelly's claim.  In connection with one of the peer physician's review, one of Ms. O'Kelly's treating physicians, Dr. Rapaport, suggested that further clinical review was needed by a physical medicine and rehabilitation specialist or a neurologist who understood mitochondrial function. (ECF No. 18-22, PageID #3664.)  At Dr. Rapaport's suggestion, Matrix Absence Management obtained two more peer physician reviews.  Finally, Matrix Absence Management obtained an occupational assessment by vocational experts.

### C.2.i. Peer Reviews by Dr. Chavez and Dr. Becker

Matrix Absence Management submitted Ms. O'Kelly's medical records, vocational information, and appeal submission documents and testimonies for peer review to two physicians:  Dr. Chavez, a board-certified psychiatrist; and Dr. Becker, a physician board-certified in internal medicine and rheumatology.  (ECF No. 18-22, PageID #3663 & #3665.)

Dr. Chavez determined that there was no psychiatric condition which was functionally impairing Ms. O'Kelly as of January 19, 2018.  (*Id.*, PageID #3683.) Similarly, Dr. Becker determined that the evidence did not support any functional impairment from a rheumatology and internal medicine perspective.  (*Id.*, PageID #3695.)

### C.2.ii. Peer Reviews by Dr Grattan and Dr. Hoenig

At Dr. Rapaport's suggestion, Matrix Absence Management submitted Ms. O'Kelly's claim to two additional peer reviewers:  Dr. Hoenig, board certified in

neurology, pain medicine, and brain injury medicine; and Dr. Grattan, board certified in pain medicine as well as physical medicine and rehabilitation. (*Id.*, PageID #3666.) Both Dr. Hoenig and Dr. Grattan attempted unsuccessfully to speak with Dr. Rapaport several times. (*Id.*, PageID #3705 & #3712.)

Dr. Hoenig determined that there were no clear neurological medical conditions affecting Ms. O'Kelly and that functional impairment was not supported from the perspective of neurology or pain medicine. (*Id.*, PageID #3705–06.) Dr. Grattan agreed that there were no clear objective neurological or musculoskeletal abnormalities to support a significant functional impairment. (*Id.*, PageID #3712.) However, he concluded that functional impairment with some restrictions and limitations was supported. (*Id.*, PageID #3713.)

### C.2.iii. Vocational Expert Review

After completion of the peer physician reviews, Matrix Absence Management referred Ms. O'Kelly's claim file for a vocational review based on the physical functional limitations that Dr. Grattan outlined. (*Id.*, PageID #3667.) On April 29, 2019, two vocational rehabilitation consultants determined that Ms. O'Kelly could perform her own occupation. (*Id.*, PageID #3734.) On May 3, 2019, the same consultants identified four other occupations Ms. O'Kelly could also perform. (*Id.*, PageID #3725.)

### D.    Evidence Relevant to Plaintiff's Arguments

Plaintiff identifies several pieces of evidence that she contends Matrix Absence Management either omitted from its consideration or wrongly discounted. Briefly, the Court reviews the medical records relevant to Plaintiff's arguments.

### D.1.   Dr. Berndtson

Dr. Berndtson, M.D., was one of Ms. O'Kelly's treating physicians.   (ECF No. 18-12, PageID #1852.)  On his initial medical visit with Ms. O'Kelly on March 3, 2017, Dr. Berndtson noted that Ms. O'Kelly presented with chronic inflammatory response syndrome.  (ECF No. 18-10, PageID #1422; ECF No. 18-12, PageID #1852.)  He also wrote: "[patient] is totally and absolutely disabled by her conditions and unable to pursue substantially gainful employment."  (ECF No. 18-10, PageID #1422.)  In 2017, Dr. Berndtson had two follow-up appointments with Ms. O'Kelly where he noted she had mild cognitive impairment.  (ECF No. 18-9, PageID #1336–40.)  On April 17, 2018, Dr. Berndtson wrote a letter certifying his concern that Ms. O'Kelly suffered from toxic encephalopathy.  (ECF No. 18-12, PageID #1852.)  He again opined that her toxic exposure to mold in damp indoor environments meant she could not sustain the physical or cognitive effort required for gainful employment.  (*Id.*, PageID #1853.)

In July 2017, Dr. Berndtson lost his license to prescribe controlled substances.  (ECF No. 18-22, PageID #3669.)  When he moved his practice to North Carolina, the North Carolina Medical Board issued a public letter of concern relating to his prior history of over-issuance of controlled substances.  (*Id.*, PageID #3669; *see also* ECF No. 24-7.)

### D.2.   Dr. Myers

Plaintiff submitted an opinion by Dr. Myers in support of her first appeal.  (ECF No 18-3, PageID #405.)  Dr. Myers, Ph.D., is a professional clinical counselor.  (ECF No. 18-12, PageID #1864.)  He assessed Ms. O'Kelly on April 5, 2018.  (*Id.*,

PageID #1860.)  Under the section for possible diagnoses, Dr. Myers opined that Ms. O'Kelly's responses to the assessment suggested the clinical syndromes of major depression, generalized anxiety disorder, and posttraumatic stress disorder.  (*Id.*, PageID #1861.)  In summary, Dr. Myers stated that Ms. O'Kelly presented with "average intellectual abilities," but that given the high-level stressors of her prior occupation it was probable she had experienced significant cognitive decline.  (*Id.*, PageID #1864.)  Dr. Myers noted that Ms. O'Kelly's mental health issues affected her ability to interact and perform as she had in the past.  (*Id.*)

### D.3.   Dr. Ackerley

In support of her second appeal, Plaintiff submitted an opinion by Dr. Ackerley. (ECF No. 18-22, PageID #3663.)  Dr. Ackerley is board-certified in integrative medicine and psychiatry.  (ECF No. 18-17, PageID #2811.)  On November 10, 2018, Dr. Ackerley consulted with Ms. O'Kelly regarding her neurological and neurocognitive symptoms.  (*Id.*)  She also reviewed Ms. O'Kelly's medical file.  (*Id.*) Specifically, Dr. Ackerley reviewed two MRI scans of Ms. O'Kelly's brain taken between 2016 and 2018.  The radiologist who read the 2016 scan determined that the results were normal.  (ECF No. 18-5, PageID #760–61.)  The results of the 2018 scan do not appear in the administrative record because Plaintiff did not produce the record to Matrix Absence Management.  (ECF No. 25, PageID #3869–70; ECF No. 26, PageID #3890 n.6.)

Contrary to the radiologist's opinion, Dr. Ackerley found that the results of the two scans were highly abnormal and consistent with environmental exposure to biotoxins and infections such as Lyme disease.  (ECF No. 18-17, PageID #2811 &

#2814.)  Dr. Ackerley opined that "Ms. O'Kelly's ongoing physical and cognitive impairment for any function requiring consistent stamina, attendance and cognitive processing is due to a multi-symptom, multi-system immunological disturbance" and that Ms. O'Kelly fit the criteria for chronic fatigue syndrome and systemic post exertional syndrome.  (*Id.*, PageID #2816.)

### D.4.  Dr. Rapaport

Also in support of her second appeal, Plaintiff submitted an opinion by Dr. Rapaport.  (ECF No. 18-22, PageID #3663.)  Dr. Rapaport is a family medicine and integrative health physician specializing in the treatment of chronic illnesses. (ECF No. 18-20, PageID #3376.)  On January 8, 2019, after two phone appointments and one in-office appointment with Ms. O'Kelly, Dr. Rapaport wrote a medical opinion regarding Ms. O'Kelly.  (*Id.*)  Dr. Rapaport opined that Ms. O'Kelly's "ongoing disability is due to a multi-symptom, multisystem immunological disorder that fulfills all criteria" for chronic fatigue syndrome and systemic post exertional syndrome.  (*Id.*, PageID #3377.)

## GOVERNING LEGAL STANDARD

Plaintiff seeks long-term disability benefits under the terms of the employee benefit plan provided to her by her former employer, the Federal Reserve Bank of Cleveland.  To protect the interests of participants in employee benefit plans and provide a uniform regulatory regime, Congress enacted the Employee Retirement Income Security Program.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).  Under ERISA, if the employee benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to

construe the terms of the plan, courts review claims under the "arbitrary and capricious" standard of review. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 n.4 (6th Cir. 1998).

However, ERISA excepts certain employee benefit plans from its regulation, including "governmental" plans. 29 U.S.C. § 1003(b)(1). Governmental plans include any plan established or maintained for its employees by the government of the United States or by its "agency or instrumentality." *Id.* § 1002(32). The Sixth Circuit has not interpreted the terms "agency or instrumentality" in the context of ERISA's governmental plan exemption. *Milby v. Liberty Life Assur. Co. of Bos.*, 102 F. Supp. 3d 922, 928 (W.D. Ky. 2015). Other courts have determined that federal reserve banks are instrumentalities of the federal government. *See Starr Int'l Co. v. Federal Rsrv. Bank of New York*, 742 F.3d 37, 40 (2d Cir. 2014) (collecting cases). Because neither Plaintiff nor Defendants contend that ERISA applies (ECF No. 23, PageID #3763; ECF No. 24-1, PageID #3813), the Court assumes without deciding that the Federal Reserve Bank of Cleveland's employee benefit plan is a governmental plan that ERISA does not cover.

Principles of contract law governs employee benefit plans that ERISA does not cover. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989); *see also Dunham v. Unum Grp.*, No. 2:13-CV-0794, 2015 WL 6798578, at *3 (S.D. Ohio Nov. 6, 2015). Plaintiff invoked the Court's jurisdiction based on both federal question and diversity. (ECF No. 1, ¶ 5, PageID #2; ECF No. 23, PageID #3757.) A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *See Klaxon*

*Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Ohio law, "contractual choice-of-law provisions are valid and enforceable." *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 932 (S.D. Ohio 2012) (citing *Schulke Radio Prod. Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 438–39, 453 N.E.2d 683, 686 (Ohio 1983)). Accordingly, the Court looks to the choice-of-law provision contained in the plan.

Here, the plan contains a choice-of-law provision stating that the plan "shall be construed, regulated and administered under the laws of the United States or the State of New York, as applicable, without regard to New York's principles regarding conflicts of law." (ECF No. 18-12, PageID #1847.) On the assumption that ERISA does not apply, and because contracts are otherwise a matter of State law, New York law applies to the contractual claims in this case. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009) (interpreting a similar choice-of-law clause).

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002). Here, the terms of the plan set out the process by which long-term disability benefits may be granted. According to the plan, the plan administrator appoints a medical board to act as a claim administrator. (ECF No. 18-12, PageID #1833.) Then, the medical board has the sole discretion to determine whether the plan participant applying for long-term disability benefits meets the plan's definition of disability.

(*Id.*, PageID #1823 & #1833.)   That is the process that occurred in this case. Accordingly, the question is what standard of review the Court should apply to the medical board's determination of total disability and the subsequent denial of benefits.

Defendants posit that the Court may only set aside the decision if it was "made in bad faith, was arbitrary or was the result of fraud." (ECF No. 24-1, PageID #3814.) Defendants draw this standard from a breach of contract action arising from the cancellation of a plaintiff's stock options pursuant to an employer provided stock benefit plan.  *Welland v. Citigroup*, No. 00 Civ. 738, 2003 WL 22973574, at *3 (S.D.N.Y. Dec. 17, 2003).  There, the stock benefit plan provided for the forfeiture of stock options on termination for cause.  *Id.*  The court upheld the forfeiture because, as the plan administrator, the employer had the sole authority to interpret its terms relating to for cause termination and the employer had a reasonable basis to conclude there was cause.  *Id.* at *11.

Plaintiff argues that *Welland* does not apply because it relates to stock options, not disability benefits.  (ECF No. 26, PageID #3883.)  Instead, Plaintiff contends that the Court should review the denial of benefits as a standard breach of contract action under the summary judgment standard.  (ECF No. 29, PageID #3961.)  In other words, in Plaintiff's view, the relevant question is whether there is a genuine issue of material fact about whether Plaintiff meets the plan's definition of disability such that Defendants breached the contract by denying her benefits.  (*Id.*, PageID #3963.)

To support her position, Plaintiff relies on *Dunham v. Unum Group*, No. 2:13-CV-0794, 2015 WL 6798578 (S.D. Ohio Nov. 6, 2015). (ECF No. 29, PageID #3960.) In *Dunham*, the court examined a breach of contract claim involving a non-ERISA benefit plan. 2015 WL 6798578, at *3. The benefit plan there defined disability as a condition that caused someone to be limited from performing the duties of that person's occupation due to sickness or injury. *Id.* at *1. The insurance company denied the claim for benefits because it determined that the claimant did not meet the plan's definition. *Id.* at *2. On review, the court considered whether the claimant met the contractual requirements for disability under the plan, such that the insurance company breached the contract by denying benefits. *Id.* at *3.

Unlike the benefit plan in *Dunham*, the plan at issue here does not simply define disability. Rather, the plan delegates authority to the medical board to make all disability determinations in its sole discretion. Consistent with this structure for administration of the plan, whether as a matter of policy administration or contract law, in the Court's view, it is necessary to disaggregate the issues of Plaintiff's disability status and Defendants' alleged breach of contract for denial of disability benefits. As a matter of general contract law, the Court is bound to enforce the discretionary delegation of decision-making authority contained in the parties' agreement. Even if the medical board reached a determination about disability status with which Plaintiff disagrees (or with which the Court or a reasonable finder of fact might disagree), whether Defendants breached the contract turns on whether

the denial of benefits was based on a valid exercise of the delegated decision-making authority.

Though *Welland* addressed a stock option benefit plan and not a disability benefit plan, it is nonetheless instructive on the applicable standard of review under New York law for the denial of benefits under a non-ERISA employer benefit plan that delegates decision-making authority.  Accordingly, the Court considers whether the decision was "made in bad faith, was arbitrary or was the result of fraud." *Welland*, 2003 WL 22973574, at *11.  Under this standard, if a reasonable basis supports the decision, the Court will not substitute its judgment for that of the medical board.  *Id.*  In the Court's view, the plan, as a contract between the parties, represents a bargain for the medical board's discretionary determination, to which the Court will give effect through this standard of review, as New York law requires.

## THE EVIDENTIARY RECORD ON SUMMARY JUDGMENT

At the outset of this litigation, the parties agreed that this matter should be handled in the same manner as that followed for plan benefit claims under ERISA. (ECF No. 11, PageID #42.)  Accordingly, the Court assigned the case to the administrative track.  (ECF No. 13, PageID #45.)  Consistent with this designation, the Court did not permit discovery.  (*Id.*)  Rather, the Court directed Defendants to supply the administrative record to Plaintiff and to file it.  (*Id.*)  Subsequently, both parties filed motions for summary judgment based on the administrative record. (ECF No. 23, PageID #3754; ECF No. 24, PageID #3798; *see also* ECF No. 25, PageID #3860.)

In her reply brief, Plaintiff argues that, because Plaintiff has not stipulated to the admissibility of the administrative record, Defendants may not rely on it. (ECF No. 29, PageID #3961–62.) In Plaintiff's view, Defendants' filings lack any supporting evidence the Court may consider. (*Id.*, PageID #3962–63.) But Plaintiff may not raise an issue for the first time in a reply brief. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). Indeed, when opposing Defendants' motion for summary judgment, Plaintiff did not raise the issue. (*See, e.g.*, ECF No. 26, PageID #3886.)

Moreover, Plaintiff's position is inconsistent with the parties' agreement to decide the case based on the administrative record. Although Plaintiff denies such an agreement (ECF No. 29, PageID #3962), the Court finds that denial unsupported in the record for at least three reasons. First, the parties' Rule 26(f) report specifically recommended deciding the case based on the administrative record. (ECF No. 11, PageID #42.) Second, the Court assigned this case to the administrative track under the Local Rules (ECF No. 13, PageID #45), which contemplates proceeding in the manner about which Plaintiff now complains, *see generally L.R.* 16.2. Third, and in any event, Plaintiff herself argues based on the administrative record. (*See, e.g.*, ECF No. 23, PageID #3765; ECF No. 29, PageID #3962.) On this record, Plaintiff's argument against consideration of the administrative record lacks merit. Nor does the argument constitute a proper objection on summary judgment. *See* Fed. R. Civ. Pro. 56(c)(2). Accordingly, the Court proceeds to rule on the parties' cross-motions for summary judgment based on the administrative record.

## ANALYSIS

Both Plaintiff and Defendants move for summary judgment.  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).

## I.    Plaintiff's Motion for Summary Judgment

As an initial matter, Plaintiff argues that she meets the plan's definition of disability. (ECF No. 23, PageID #3763–67.)  Under the applicable standard of review, this question is not before the Court and need not detain it further.  Accordingly, the Court turns to Plaintiff's arguments regarding Matrix Absence Management's decision-making process.   Primarily, Plaintiff argues that Matrix Absence Management's determination that she was not disabled was arbitrary because it omitted some evidence from consideration and improperly weighed other evidence. Secondarily, Plaintiff argues that Matrix Absence Management's determination was tainted by a conflict of interest or bias.

18

## I.A.    Arbitrary Decision by Matrix Absence Management

Plaintiff argues that Matrix Absence Management's determination that she was not disabled was arbitrary.  (ECF No. 23, PageID #3768.)  A plan administrator's decision is not arbitrary if it results from deliberate, principled reasoning and is supported by substantial evidence.  *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022).  The administrator may not selectively review the administrative record and must instead consider all opinions on both sides of a disputed disability question.  *Id.* at 415.  But when the record contains evidence that could support a rational decision in either direction, the administrator's choice between conflicting evidence cannot be considered arbitrary. *Id.* at 412.

### I.A.1. February 2017 Psychological Report

Plaintiff points out that in the initial denial of benefits letter, Matrix Absence Management did not address the February 2017 independent psychological examination.  (*Id.*, PageID #3885; *see* ECF No. 18-3, PageID #392–95.)  When approving Plaintiff's claim initially, Matrix Absence Management relied on the February 2017 psychological report.

On its first review of Plaintiff's claim, Matrix Absence Management requested and received medical records from four treating providers for a time period ranging from August 2015 to January 2018.  (ECF No. 18-3, PageID #392–93.)  Matrix Absence Management reviewed and summarized those medical records and concluded that they documented normal exam findings and normal and improved psychiatric assessments.  (*Id.*, PageID #393–95.)  Additionally, the records showed

19

that there was no credible evidence to support impairment due to mold exposure. (*Id.*, PageID #393–95.)  Based only on Matrix Absence Management's omission of the February 2017 psychological report, Plaintiff argues that this constituted selective review of the record used to justify a decision to terminate her benefits.  (ECF No. 23, PageID #3769.)

However, while Matrix Absence Management did not address the psychological report in its initial benefit denial letter, it did address the report in its second and third benefit denial letters.  (ECF No. 18-3, PageID #411; ECF No. 18-22, PageID #3647.)  In its second benefit denial letter, Matrix Absence Management explained that the psychological report dated back to February 2017 and that it reviewed medical documentation as recent as September 19, 2018.  (ECF No. 18-3, PageID #411.)  Matrix Absence Management emphasized that its decision was based on current medical documentation.  (*Id.*, PageID #412.)  As a general matter, it is reasonable to accord greater weight to more recent medical records than to older ones. *See Brooks v. Commissioner of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (remanding determination based on ALJ's adoption of non-examining source's earlier opinion over the more recent examining findings).  Given Matrix Absence Management's consideration of the February 2017 psychological report in its second and third review of Plaintiff's claim, omission of the report from the first denial letter does not support a claim that Matrix Absence Management acted arbitrarily.

### I.A.2. Dr. Berndtson

Plaintiff relies on Dr. Berndtson's diagnosis of chronic respiratory inflammatory response syndrome and toxic encephalopathy and on Dr. Berndtson's opinion that Ms. O'Kelly was disabled.  (ECF No. 23, PageID #3760–61 & #3766–69.)

Defendants counter that Matrix Absence Management considered Dr. Berndtson's opinions but discounted them because of a lack of credibility.  (ECF No. 25, PageID #3867–68.)  In evaluating Dr. Berndtson's opinion, Matrix Absence Management considered the opinion of Dr. Swotinsky, a reviewing physician with a specialty in toxicology, in which he explained that evidence-based medical reviews did not support a causal association between toxic encephalopathy and exposure to damp indoor environments.  (ECF No. 18-22, PageID #3655; *see also* ECF No. 18-13, PageID #2018.)  Further, Matrix Absence Management considered Dr. Berndtson's disciplinary record.  (ECF No. 18-22, PageID #3669.)

Plaintiff argues that Dr. Swotinsky was incorrect because medical evidence does support a link between exposure to mold and toxic encephalopathy.  (ECF No. 26, PageID #3887–88.)  On that point, the evidence conflicted.  Because Matrix Absence Management had a reasonable basis for crediting Dr. Swotinsky's opinion over Dr. Berndtson's, its decision to do so was not arbitrary.

### I.A.3. Dr. Myers

Plaintiff objects that Dr. Washington, a peer physician reviewer for Plaintiff's first appeal, did not respond to or rebut Dr. Myers' opinion.  (ECF No. 23, PageID #3770.)  Also, Plaintiff objects that Dr. Swales, an independent medical examiner who

Matrix Absence Management retained after Plaintiff's first appeal, did not critique or rebut Dr. Myers' opinion. (*Id.*, PageID #3771.)

Plaintiff argues it was arbitrary for Defendants not to consider fully all the relevant evidence supporting Plaintiff's claim. The authority Plaintiff cites support this general proposition. *See Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (abuse of discretion to refuse to consider additional evidence or engage in a selective review of the administrative record); *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015) (same). But Plaintiff objects only to the failure of the physician reviewer (Dr. Washington) and medical examiner (Dr. Swales) to consider fully Dr. Myers' opinion. Plaintiff points to no authority suggesting that reviewing or examining physicians must either agree with or rebut each medical opinion contained in the medical record. Rather, Matrix Absence Management, as the decisionmaker, must consider all relevant evidence. Matrix Absence Management considered Dr. Myers' opinion on Plaintiff's first and second appeal. (ECF No. 18-3, PageID #405; ECF No. 18-22, PageID #3653.)

Additionally, Matrix Absence Management considered several peer reviewing physicians' commentaries on Dr. Myers' opinion. Dr. Swotinsky noted that records of "evaluation/treatment for a psychiatric illness" consisted only of Dr. Myers' "symptom survey." (ECF No. 18-13, PageID #2014.) Dr. Washington noted that Dr. Myers' assessment reflected only "possible diagnoses" and a determination that it was "probable" that she had experienced cognitive decline. (ECF No. 18-13, PageID #2026.) Dr. Chavez, a reviewing psychiatrist, noted regarding Dr. Myers' report that

22

Plaintiff "was reported to potentially have multiple psychiatric conditions but no specific diagnosis was offered and no recommendation for psychiatric impairment or restriction was made."  (ECF No. 18-22, PageID #3683.)

In its third and final denial letter, Matrix Absence Management reasoned that though Plaintiff underwent "several psychological evaluations, no definitive diagnosis has been made by any of the evaluators." (*Id.*, PageID #3670.)  It also noted that Plaintiff was not undergoing any regular and active treatment for her depressive or anxiety symptoms and had not been prescribed any psychotropic medications for her symptoms.  (*Id.*)  Given Matrix Absence Management's review of Dr. Myers' opinion and analysis of Plaintiff's psychological health based on the records before it, Defendants did not act arbitrarily.  Nor has Plaintiff shown that Matrix Absence Management failed to consider Dr. Myers' opinion or improperly weighed it against other medical opinions, such as those of Dr. Chavez and Dr. Swales.

### I.A.4. Dr. Rapaport

Plaintiff submitted an opinion by Dr. Rapaport in support of her second appeal. Dr. Chavez, the peer reviewing psychiatrist, had a peer-to-peer discussion with Dr. Rapaport.  (ECF No. 18-22, PageID #3683–84.)  After reviewing the medical record and speaking with Dr. Rapaport, Dr. Chavez concluded that there was no support for a psychiatric impairment.  (*Id,* PageID #3664.)  In her discussion with Dr. Chavez, Dr. Rapaport recommended that a physical medicine and rehabilitation specialist or a neurologist who understood mitochondrial function evaluate Plaintiff. (*Id.*)  In response, Matrix Absence Management obtained two additional peer physician reviewers, Dr. Hoenig and Dr. Grattan.  Neither reviewer could reach

Dr. Rapaport despite multiple attempts. Both reviewers determined that there were no clear neurological abnormalities to support significant functional impairment. (*Id.*, PageID #3705–06 & #3712.)

Matrix Absence Management considered Dr. Rapaport's opinion. (*Id.*, PageID #3659.) It noted that Dr. Rapaport had one in-person visit and two phone calls with Plaintiff. (*Id.*) Moreover, at Dr. Rapaport's suggestion, Matrix Absence Management sought out additional specialists to review Plaintiff's claim. Dr. Chavez, Dr. Hoenig, and Dr. Grattan each concluded that there was no support for significant psychiatric impairment. Given Matrix Absence Management's consideration of Dr. Rapaport's opinion and the conflicting opinions of the reviewing physicians, Matrix Absence Management did not act arbitrarily or improperly weigh Dr. Rapaport's opinion.

### I.A.5. Dr. Ackerley

Plaintiff submitted an opinion from Dr. Ackerley in support of her second appeal. Dr. Chavez reviewed Dr. Ackerley's opinion, though he did not speak with Dr. Ackerley. (*Id.*, PageID #3680.) Based on his review, Dr. Chavez concluded that the medical evidence did not support functional impairment due to a psychiatric condition. (*Id.*, PageID #3686.)

In its final denial letter, Matrix Absence Management considered and addressed Dr. Ackerley's opinion. (*Id.*, PageID #3658 & #3669.) Matrix Absence Management noted that Dr. Ackerley's examination of Plaintiff was limited to one visit. (*Id.*, PageID #3668.) Further, Matrix Absence Management pointed out that Dr. Ackerley's opinion was based on her interpretation of two MRI scans of the brain, which Dr. Ackerley interpreted as "highly abnormal." Two prior radiologists and

24

Plaintiff's primary care physician found that the MRI scans showed normal results. (*Id.*, PageID #3658 & #3669.)  Plaintiff did not provide the 2018 MRI brain scan results to Matrix Absence Management, so it was unable to consider the results or evaluate Dr. Ackerley's analysis and credibility based on the results.

Given Matrix Absence Management's consideration of Dr. Ackerley's opinion and its weighing of her opinion against other conflicting opinions in the record, including Dr. Chavez's, Plaintiff has not shown that Matrix Absence Management acted arbitrarily.

### I.A.6. Dr. Swales

Plaintiff argues that Matrix Absence Management improperly relied on Dr. Swales' opinion.  (ECF No. 23, PageID #3771–72.)  She points out that Dr. Ackerley and Dr. Rapaport criticized Dr. Swales' report in their opinions, which Plaintiff provided to Matrix Absence Management in support of her second appeal. (*Id.*)  Plaintiff reiterates Dr. Ackerley's rebuttal of Dr. Swales' conclusions and Dr. Rapaport's questioning of Dr. Swales' qualifications and opinion that Dr. Swales was ignorant of the medical literature on chronic fatigue syndrome.  (*Id.*)

Plaintiff does not advance specific arguments about Dr. Swales' qualifications or his knowledge of medical literature.  As to qualifications, Dr. Swales is a board-certified psychologist.  Defendants contend that Dr. Swales administered tests that are widely accepted in the psychology and neuropsychology community.  (ECF No. 25, PageID #3875.)  Plaintiff does not contend otherwise.  As to Dr. Swales' conclusions, Plaintiff presented conflicting opinions by Dr. Ackerley and Dr. Rapaport.  As

discussed above, Matrix Absence Management's weighing of conflicting evidence and crediting of one medical opinion over another does not constitute arbitrary action.

### IA.7.  Social Security Disability Insurance Award

Finally, Plaintiff argues that Matrix Absence Management did not adequately address Plaintiff's favorable social security disability insurance award.  (ECF No. 23, PageID #3775.)   A plan administrator's "failure to mention and rebut a [social security disability insurance] award" is a factor that weighs in favor of finding the administrator's decision was arbitrary.  *Rossiter v. Life Ins. Co. of N. Am.*, 400 F. Supp. 3d 669, 682 (N.D. Ohio 2019) (quoting *O'Callaghan v. SPX Corp.*, 442 F. App'x 180, 185 (6th Cir. 2011)).

Here, Matrix Absence Management considered the Social Security Administration's favorable determination for social security disability insurance benefits.  (ECF No. 18-22, PageID #3670.)  Matrix Absence Management noted that the determination was based on Plaintiff's clinical presentation at the time of the decision, on March 12, 2017, where Plaintiff's mental residual functional capacity was deemed limited due to "psychologically based symptoms."  (*Id.*)  Matrix Absence Management explained that it based its determination on updated clinical information obtained since the Social Security Administration's approval of benefits and relied on the peer reviews of four board-certified physicians.  (*Id.*)  This is a meaningful explanation that addresses why Matrix Absence Management took a different position than the Social Security Administration.

26

## I.B.    Conflict of Interest or Bias

In addition to arguing that Matrix Absence Management acted arbitrarily, Plaintiff contends that it had a conflict of interest or bias that motivated the benefits determination at issue.  (ECF No. 23, PageID #3758.)  She argues that Matrix Absence Management has a conflict of interest because the plan administrator pays Matrix Absence Management for its services and Matrix Absence Management has an interest in maintaining that profitable relationship.  (ECF No. 29, PageID #3968.)

A court is required to take a conflict of interest into account in determining whether a decision is arbitrary only where there is "significant evidence" that self-interest motivated the decisionmaker. *Wages v. Sandler O'Neill & Partners, L.P.*, 37 F. App'x 108, 112 (6th Cir. 2002) (quoting *Peruzzi v. Summa Med. Plan,* 137 F.3d 431, 433 (6th Cir. 1998.  In a benefits denial case based on the administrative record, limited discovery beyond the record may be appropriate when it is offered in support of a procedural challenge to the administrator's decision. *Johnson v. Connecticut Gen. Life Ins. Co.*, 324 F. App'x 459, 466 (6th Cir. 2009).

At the outset of the litigation, Plaintiff sought to conduct discovery related to Defendants' conflict of interest or bias.  The Court determined that Plaintiff's allegation regarding Defendants' conflict of interest or bias appeared not to meet the pleading requirements set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  (Minutes, Feb. 18, 2020.)  Accordingly, the Court did not permit discovery. (ECF No. 13, PageID #45.)  Since then, Plaintiff did not seek to revisit the issue.

Plaintiff provides no evidence (*prima facie* or otherwise) suggesting that Matrix Absence Management's review process is biased in favor of the Federal

27

Reserve System.  Therefore, on the record presented, Plaintiff has not shown that any conflict of interest or bias influenced Matrix Absence Management's decisions.

*     *     *

Because Plaintiff has not shown that Matrix Absence Management's decision to deny her claim for long-term disability benefits was arbitrary, made in bad faith, or resulted from fraud, she is not entitled to judgment as a matter of law.  Nor does the record support Plaintiff's claim of a conflict of interest or bias.

## II.    Defendants' Motion for Summary Judgment

Defendants also move for summary judgment, on three bases.

*First*, Defendants argue that Matrix Absence Management reasonably relied on two vocational reviews which determined that Plaintiff could perform her own or another occupation.  (ECF No. 24-1, PageID #3815; *see* ECF No. 18-22, PageID #3722–34.)

*Second*, Defendants maintain that substantial evidence supported Matrix Absence Management's determination that Plaintiff was not disabled due to a cognitive impairment.  (ECF No. 24-1, PageID #3816.)  On this point, Defendants rely on Dr. Swotinsky's opinion that there is no causal association between indoor mold exposure and toxic encephalopathy and that the general medical community does not recognize chronic immune response syndrome.  (ECF No. 24-1, PageID #3816.)  Also, Defendants point to the lack of objective evidence in the record suggesting that Plaintiff suffered from any neurological impairment.  (ECF No. 24-1, PageID #3817.) Finally, Defendants point to evidence in the record supporting Matrix Absence

28

Management's conclusion, including the opinions of Plaintiff's treating primary care physician and seven reviewing physicians.  (ECF No. 24-1, PageID #3817–18.)

*Third*, Defendants maintain that substantial evidence supported Matrix Absence Management's conclusion that Plaintiff was not disabled due to a psychiatric condition.  Defendants rely on Dr. Chavez's opinion and the lack of any psychiatric diagnosis in the record.  (ECF No. 24-1, PageID #3820–21.)  Regarding the previous findings of disability by the Social Security Administration and Matrix Absence Management, Defendants argue that its contrary determination is based on updated clinical information obtained after those findings were made.  (ECF No. 24-1, PageID #3821.)

In response, Plaintiff makes many of the same arguments she advanced in her motion for summary judgment, including:  Matrix Absence Management's failure to consider the February 2017 psychiatric report on its first denial; insufficient consideration of the opinions of Dr. Myers, Dr. Ackerley, and Dr. Rapaport; and improper reliance on Dr. Swotinsky's opinion over Dr. Berndtson's opinion.  (ECF No. 26, PageID #3884–90.)  These arguments are fully addressed above.  For the reasons previously discussed, Matrix Absence Management's review of and choice between conflicting evidence was not arbitrary.

Additionally, Plaintiff objects to Defendants' reliance on the vocational reviews because the vocational experts only addressed physical impairments and not mental and cognitive impairments.  (ECF No. 26, PageID #3886–87.)  But Matrix Absence Management concluded, based on substantial evidence, that Plaintiff was not

29

disabled due to cognitive or psychiatric impairment.  Accordingly, Matrix Absence Management's reliance on vocational reviewers who considered only Plaintiff's physical impairments was reasonable—and certainly not arbitrary.

For the reasons described above, Defendants have shown that a reasonable basis supports Matrix Absence Management's decision.  Because no reasonable jury could find otherwise, under the governing standard of review, Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court determines that Plaintiff has not shown that Matrix Absence Management's decision to terminate her long-term disability benefits was made in bad faith, arbitrary, or the result of fraud.  Further, the Court determines that Defendants have shown that a reasonable basis supports Matrix Absence Management's decision and that no reasonable finder of fact could find otherwise.  Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment (ECF No. 23) and **GRANTS** Defendants' motion for summary judgment (ECF No. 24).

**SO ORDERED.**

Dated:  August 11, 2022

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio